UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

VALERIE GAUDINO,

                              Plaintiff

                                                            DECISION AND ORDER

-vs-
                                                            10-CV-6656 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.

_____

APPEARANCES

For the Plaintiff:          Mark M. McDonald, Esq.
                            Bond and McDonald
                            91 Genesee Street
                            Geneva, New York 14456

For the Defendant:          Kathryn L. Smith, A.U.S.A.
                            United States Attorney's Office
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Valerie Gaudino ("Plaintiff") for Social Security disability

benefits.  Now before the Court is Defendant's motion [#5] for judgment on the pleadings

and Plaintiff's cross-motion [#9] for judgment on the pleadings.  Defendant's application

is denied, Plaintiff's cross-motion is granted, and this matter is remanded for further

administrative proceedings.

PROCEDURAL HISTORY

On November 13, 2007, Plaintiff applied for disability and Supplemental Security Income ("SSI") benefits.  On May 16, 2008, the Social Security Administration ("SSA") denied the applications.  On January 1, 2010, a hearing was held before an Administrative Law Judge ("the ALJ").  On April 9, 2010, the ALJ issued a decision finding that Plaintiff was not disabled.  Plaintiff appealed, and on September 24, 2010, the Appeals Council denied the appeal.

On November 18, 2010, Plaintiff commenced this action.  Plaintiff contends that the ALJ erred in several ways.  First, Plaintiff maintains that the ALJ failed to classify her depression, left shoulder/arm pain, and right knee pain, as serious impairments.

Next, Plaintiff maintains that the ALJ erred by failing to properly apply the treating physician rule.  On this point, Plaintiff asserts that the ALJ failed to give appropriate weight to the opinions of her treating pain-management specialist, Ashraf Sabahat, M.D. ("Sabahat"), consulting rheumatologist Laura Llinas-Lux, M.D. ("Llinas-Lux"), and consulting psychologist Maureen McAndrews, Ph.D. ("McAndrews").

Moreover, Plaintiff maintains that the ALJ's Residual Functional Capacity ("RFC") determination was erroneous.  On this point, Plaintiff contends that, as a result of failing to follow the treating physician rule, and by selectively relying on the opinion of Harbinder Toor, M.D. ("Toor"), a non-treating, examining agency physician,  the ALJ incorrectly concluded that Plaintiff could perform light work involving simple instructions, with postural limitations.

Plaintiff further contends that the ALJ erred by finding that she could perform her past relevant work, since the jobs that the ALJ identified do not qualify as substantial

2

gainful activity ("SGA") under the Commissioner's regulations, and therefore cannot be considered past relevant work.

Finally, Plaintiff maintains that the ALJ failed to properly assess Plaintiff's credibility.

## VOCATIONAL HISTORY

Plaintiff was 43 years old at the time of the hearing. (28)[1].  Plaintiff completed high school. (31)  Plaintiff stopped working in 2000 due to her claimed disability, but subsequently performed some work in 2004, 2005, and 2006. (28)  In 2004 Plaintiff worked as a cashier at a gas station, and in 2005-2006 she worked as a cashier at a Lowes home improvement store. (29)  Plaintiff's longest period of employment at one job was for ten years, between 1990 and 2000, when she worked as a "laborer/assembly line worker" at a "metal/steel manufacturing company." (124)  Plaintiff indicates that this job involved standing at an assembly line "all day every day," frequently lifting objects weighing up to 25 pounds, and occasionally lifting up to 50 pounds. (124-125)

## ACTIVITIES OF DAILY LIVING

Plaintiff indicates that she cannot lift anything weighing more than five pounds, and that she needs help from her husband and children to clean the house. (33, 44)  She states that she cooks, but is limited as to what she can cook because of her inability to lift. *Id*.  Plaintiff states that her back pain is usually nine on a scale of one-to-ten. (33)  She further states that her leg pain is eight out of ten, and that she has difficulty walking distances and going up stairs. (34)  Plaintiff indicates that she has ankle pain, and wears

---

[1]Unless otherwise noted, references are to the administrative record.

braces on both ankles. (35-36)  Plaintiff states that she has neck pain, which also causes her to have headaches, the pain of which is nine out of ten. (36-37)   Plaintiff also indicates that the pain interferes with her sleep, and that she wakes often during the night, and takes naps during the day. (37)  Plaintiff contends that she has fibromyalgia which causes her entire body to feel bruised. (37)  Plaintiff reports that she had surgery on both of her ulnar nerves, but that she still has problems, including numbness in her hands and muscle spasms. (40)  Plaintiff also indicates that she is being treated for depression which causes her to feel "sad a lot." (41)  In that regard, she indicates that she feels worthless because there are many things that she cannot do because of her physical limitations. (41)  Plaintiff also experiences periods of insomnia, in which she will not sleep for a couple of days, because of anxiety. (42)  Plaintiff states that she takes a number of medications, for pain, allergies, depression, and urinary incontinence, which make her drowsy and nauseous. (42-44)  Plaintiff states that she can only sit comfortably for fifteen-to-twenty minutes before needing to move around, and that she can stand for "sometimes a half hour." (47)  She indicates that she is able to walk not "very far," "maybe a block." (47)

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety.  It is sufficient for purposes of this Decision and Order to note the following facts.

*Left Arm and Shoulder*

On December 4, 2000, Plaintiff had acromioplasty[2] surgery on her left shoulder. On January 31, 2001, George Pokorny, M.D. ("Pokorny") reported that Plaintiff had "not experienced much improvement" from the surgery. (238)  On February 15, 2001, Pokorny indicated that Plaintiff received a nerve block, which helped temporarily, but that she was still having muscle spasms and pain. (234)  On March 21, 2001, Pokorny observed that Plaintiff's range of motion was still "considerably limited." (230)  On April 25, 2001, Plaintiff complained to Pokorny of tingling in her hand, intermittent shooting pain, and increased pain "with any movement." (225)  Pokorny noted, "I feel the patient is developing a fibromyalgia," *Id*., but added that Plaintiff was going to see a rheumatologist for a more definite opinion regarding fibromyalgia. (223)  On July 5, 2001, Pokorny reported that Plaintiff's range of motion was decreased, and that she "has a component of myofascial-type pain and now is presenting with decreased range of motion of adhesive capsulitis."[3] (219)  On January 30, 2002, Pokorny noted that Plaintiff had "some chronic pain along with a permanent loss-of-function of the left upper extremity." (214)

On March 7, 2007, Steven Garner, M.D. ("Garner"), examined Plaintiff's left shoulder and reported essentially normal findings, although Plaintiff complained of tenderness over the shoulder joint. (197-198)  On March 21, 2007, Garner noted that Plaintiff was continuing to complain of significant pain, which Garner indicated was likely "secondary to AC joint arthropathy and impingement syndrome." (193)  On March 22,

---

[2] Acromioplasty is defined as "excision of the anterior hook of the acromion for the relief of pressure on the rotator cuff produced during movement of the joint between the glenoid cavity and the humerus." http://www.merriam-webster.com/medical/acromioplasty

[3] Adhesive capsulitis, or "frozen shoulder," "is when the shoulder is painful and loses motion because of inflammation." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001490/

2007, an MRI of Plaintiff's left shoulder showed that Plaintiff had previously undergone acromioplasty, but that the shoulder joint was essentially normal. (240)  On March 29, 2007, Garner indicated that Plaintiff was continuing to complain of pain, and that his impression was "[u]nresolving left shoulder pain of unknown etiology." (191)

On May  9, 2007, Plaintiff was involved in a motor vehicle accident ("MVA") which resulted in a fracture of Plaintiff's left forearm, with displacement (285).  The fracture was repaired with a metal plate and screws, and required skin grafting to close the wound. (308, 317, 355)  As of March 17, 2008, Plaintiff was continuing to complain of intermittent numbness and weakness in the left arm, but a nerve conduction study of the arm was "essentially normal." (386-387)

### Right Arm

On September 4, 2008, Plaintiff had a nerve conduction study on her right arm, as a result of pain that she was experiencing after she fell in August 2008. (453)  The study was "borderline abnormal," with "mild evidence of dysfunction in a right ulnar nerve distribution." (453)

### Right Knee and Ankle

On February 9, 2006, Plaintiff complained to Sabahat of chronic knee pain, due to arthritis. (347)  As noted above, On May  9, 2007, Plaintiff was involved in a motor vehicle accident ("MVA"), which, in addition to fracturing her left forearm, resulted in a contusion to her right knee. (286)  Testing indicated marked soft tissue swelling, and "minimal to mild spurring arising from the posterior aspect of the right patella." (286) Plaintiff also exhibited "right ankle instability" on admission to the hospital following the MVA. (295)  An orthopedic surgeon examined the ankle and diagnosed a "gross

dislocation" of the ankle, with no fracture. (298)  On July 11, 2007, x-rays "suggested" "old medial collateral ligamentous injury," but "no definite acute abnormality." (358) On November 16, 2007, Plaintiff complained of continuing pain, swelling, and instability in the right ankle. (350)  Upon examination, the ankle was swollen and tender. *Id*.

   *Spine*

   On February 9, 2006, Plaintiff told Sabahat that her back pain was a stabbing pain that radiated into both legs, which was aggravated by standing for long periods, lifting any weight, and driving. (347)  Plaintiff told Sabahat that her pain began in 1992 following a motor vehicle accident in which her car was struck from behind. (347)  On October 19, 2006, Sabahat reported that Plaintiff's straight-leg raise testing was positive bilaterally. (340)  On November 30, 2006, Sabahat noted that Plaintiff was continuing to complain of pain in her neck and back. (339)  Sabahat indicated that MRI testing revealed a "left lateral L5-S1 herniated disc, extrusion impinges left L5 neural foramina effacing  perineural fat, broad L5-S1 disc bulge with facet arthropathy and anterolisthesis causing mild spinal stenosis at L5 region," "chronic appearing disc bulges at multiple levels," and "facet arthropathy at L4-L5." (339)  Sabahat noted that a duragesic pain patch was not controlling Plaintiff's pain. *Id*.  On December 14, 2006, Sabahat reported that Plaintiff was complaining of chronic pain in her lower and upper back, and that various "narcotic pain medications" were not alleviating her pain. (338)  Sabahat indicated that Plaintiff was complaining of severe pain in her lower back that was radiating into both legs, "in L4-L5 and L5-S1 nerve distribution." (338)  Sabahat prescribed Vicodin and Lyrica, and planned to have Plaintiff receive facet joint injections.

On May 9, 2007, following her MVA, a CT scan of Plaintiff's cervical spine showed "minimal reversal of the cervical lordosis at C5-6," and "some spondylosis at C5-6 level." (288)  The quality of the CT scan did not permit the radiologist to determine whether there was any disc pathology. *Id*.  As for the lumbar spine, a CT scan showed "some degenerative changes . . . with degenerative disc disease." (290)  Specifically, the scan showed "degenerative disc disease involving [the] L5 disc." (292)  The scan also showed a small avulsion fracture of the L1 vertebral body. *Id*.  Degenerative changes were also noted in the thoracic spine. (291)

On August 16, 2007, Sabahat examined Plaintiff and noted that she had a "chronic history of upper and lower back pain." (336)  Sabahat indicated that Plaintiff was a "noncompliant patient," since she had refused referrals to a neurosurgeon and a referral for a nerve conduction study. *Id*.  Upon examination, Sabahat found that Plaintiff was "tender with deep palpation over bilateral sacroiliac joints," but that straight-leg raise testing was negative. (336)

On April 4, 2008, Toor conducted a consultative orthopedic examination in connection with Plaintiff's application for disability benefits. (397-400)  Upon examination, Plaintiff appeared to be in pain in her back and ankles. (398)  Plaintiff's gait was abnormal and she was limping on the right side. *Id*.  Plaintiff had full finger dexterity and hand strength. (399)  The cervical spine showed no spasm or trigger points. (399)  Plaintiff had pain in both shoulders with movement. (399)  The thoracic and lumbar spine showed no spasm or trigger points. (399)  Plaintiff had full range of movement in her legs and knees, with full strength, and ankle pain. (399)  Toor's prognosis was "fair," and he

stated: "The claimant has a moderate limitation twisting, bending, and extending of the neck spine.  She has a moderate limitation pushing, pulling, and reaching because of pain in the shoulders.  She has a moderate to severe limitation bending and heavy lifting. She has a moderate limitation standing, walking, or sitting a long time.  Her obesity also plays a role in her daily routine." (400)  X-rays taken the same day as the examination showed, in the lumbosacral spine, "a 1 cm slippage of L5 due to considerable facet arthritis  in the lower lumbar spine mainly on the left side. " (401)   For the cervical spine, the x-ray showed "mild degenerative disc disease at C5-C6 level with encroachment upon the intervertebral foramina by posterior spurs on the right side." (401)

On May 14, 2008, non-examining, non-treating agency reviewer C. Vriesema ("Vriesema") completed a physical residual functional capacity assessment form, which, in pertinent part, indicated that Plaintiff could lift up to 20 pounds occasionally, sit for six hours in an 8-hour workday, stand/walk for six hours in an 8-hour workday, and perform unlimited pushing and/or pulling. (426)  Vriesema did not explain the basis for such opinion, although s/he observed that Plaintiff had been noncompliant with Sabahat's recommendations for consulting a neurosurgeon and having nerve conduction studies. (426)

Although Plaintiff had previously not taken Sabahat's advice to see a neurosurgeon, she eventually did so.  On January 16, 2009, Carson J. Thompson, M.D. ("Thompson"), Chief of Neurosurgery at Guthrie Clinic, examined Plaintiff and indicated that she was a candidate for surgery on her lumbosacral spine, but would have to lose a significant amount of weight (about 80 pounds) before such surgery could be performed. (472)  Specifically, Thompson stated that such surgery would address Plaintiff's

"spondylolysis with spondylolisthesis at L5-S1. *Id*.  Thompson stated, however, that

Plaintiff "ha[d] nothing of concern in the cervical area" that would explain her pain, and

that such pain appeared to be caused by problems in her "shoulder capsule." (472)

On February 10, 2010, Sabahat completed a residual functional capacity report

concerning Plaintiff's low back pain. (527)  Sabahat indicated that Plaintiff's pain was

"severe," and that Plaintiff could only work two hours per day. *Id*.  Sabahat indicated that

Plainiff could stand for up to 30 minutes at a time  and sit for 30 minutes at a time. *Id*.

### *Fibromyalgia*

On December 10, 2009, Plaintiff underwent a rheumatology consultation with

Llinas-Lux at the request of Sabahat. (518)  Llinas-Lux reported that Plaintiff had "18/18

tender points on exam with a lot of paraspinal muscle spasm, spasm in the neck and

trapezius area." (520)  Llinas-Lux's impression was "degenerative arthritis of the lumbar

and cervical spines with clinical features of fibromyalgia syndrome characterized by sleep

disturbance, generalized pain, lack of exercise, and ongoing depression with 18/18

tender points on exam." (521)  Sabahat also observed, during his examinations, that

Plaintiff had pain with deep palpation of her lumbar spine and multiple trigger points.

(526)

On February 10, 2010, Sabahat completed a residual functional capacity report

concerning Plaintiff's fibromyalgia. (528)  Significantly, Sabahat indicated that Plaintiff

could only work two hours per day total.  Sabahat further indicated that Plaintiff could

stand for up to 30 minutes at a time and for two hours per day maximum, and could sit

for 30 minutes at a time, and up to two hours per day maximum. (528)  Additionally,

Sabahat stated that Plaintiff could lift no more than ten pounds, and could occasionally bend, stoop, and raise her arms above shoulder level. *Id*.

<u>Depression</u>

On March 19, 2008, Plaintiff began treating with Steuben County Mental Health Clinic. (Docket No. [#9-2] at p. 32)[4]  Plaintiff was discharged six months later, because she stopped attending appointments. *Id*.  Office notes indicate that Plaintiff initially sought a mental health evaluation as a condition of her probation following her MVA. Plaintiff then sought treatment, and was seen on five occasions for individual therapy. *Id*. Deborah Turner, Ph.D. ("Turner") reported that Plaintiff appeared anxious and depressed following her MVA.  Plaintiff indicated that she felt guilty for causing the accident, which injured her sister and her sister's boyfriend. *Id*. at p. 36.  Plaintiff tearfully revealed that she suffered a traumatic event as a child, when she witnessed her younger brother's death, after he was hit and dragged by a truck while they were waiting for the school bus. *Id*. at p. 44.  Plaintiff stated that she did well in school, and that after completing high school, she completed 1.5 years "studying paralegal and liberal arts" courses. *Id*. at p. 46.  Turner's diagnosis was "adjustment disorder with mixed anxiety," and treatment notes indicate that Plaintiff was "anxious and depressed" (Docket No. [#9-2] at p. 34)

On April 4, 2008, McAndrews conducted a consultative psychiatric evaluation. (389-395)  Plaintiff was cooperative and tearful at times. (391)  Plaintiff indicated that she felt extreme guilt about causing the MVA in which she and her passengers were injured.

---

[4]The medical records from Steuben County Mental Health Clinic were not part of the administrative record, but were submitted to this Court by Plaintiff along with her motion for judgment on the pleadings.

(389)  McAndrews observed that, as discussed above, Plaintiff was receiving mental health treatment. (389) ("There is current psychiatric care obtained from Dr. Turner at Bath Mental Health Clinic.  The claimant is being treated for depression and guilt.") Plaintiff stated that, in addition to depression and guilt, she had "panic, pain, and cries all the time." (389)  McAndrews reported that Plaintiff's affect was dysphoric, her mood was dysthymic, her attention and concentration were intact, and her memory was "mildly impaired due to emotional distress secondary to anxiety, depression, and pain." (392) McAndrews found that Plaintiff's cognitive functioning was "in the average range," and that her insight and judgment were good. (392)  Significantly, McAndrews expressed doubt about Plaintiff's ability to work: "Results of the examination appear to be consistent with psychiatric and cognitive problems, and this may significantly interfere with the claimant's ability to function on a daily basis." (393)  In that regard, McAndrews concluded that Plaintiff could not maintain attention and concentration or maintain a regular schedule due to fatigue, depression, and pain. *Id*.  Overall, McAndrews found that Plaintiff could perform even complex tasks, provided that they were within her physical limitations, but that her ability to work was limited by "fatigue, pain, disruptions in cognitive functioning associated with pain, and depression." (393)  McAndrews' diagnosis was Major depressive disorder, severe, panic disorder, and cognitive disorder, NOS (not otherwise specified). (394)

On May 13, 2008, non-examining non-treating agency review psychologist A.

Hochberg ("Hochberg") completed a Psychiatric Review Technique form. (407-420)[5]

Hochberg indicated that Plaintiff had "major depression" and "panic disorder." (410, 412)

Hochberg stated that Plaintiff would have mild limitations in activities of daily living and

maintaining social functioning, and moderate limitations maintaining concentration,

persistence or pace. (417)  Hochberg also completed a Mental Residual Functional

Capacity Assessment form (421-424), indicating that Plaintiff had moderate limitations

with regard to understanding and remembering detailed instructions, carrying out detailed

instructions, maintaining concentration and attention for extended periods, performing

activities within a schedule, completing a normal workday and workweek without

interruptions from psychologically based symptoms, and performing at a consistent pace

without an unreasonable number of breaks. (421-422)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner

of Social security as to any fact, if supported by substantial evidence, shall be

conclusive."  The issue to be determined by this Court is whether the Commissioner's

conclusions "are supported by substantial evidence in the record as a whole or are based

on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any

---

[5]On first glance, the form appears to have been left completely blank.  However, upon closer inspection, many of the boxes on the form are checked, although the marking is extremely faint and difficult to see.  This may explain why Plaintiff contends, as part of her motion, that the ALJ failed to obtain a Psychiatric Review Technique form as required by 20 C.F.R. § 1520a. *See*, Pl. Memo of Law [#9-2] at p. 21.

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

At step five of the five-step analysis above, the Commissioner may carry his

burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt.

404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation

omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused

limitations considered in each rule are exertional limitations.")  However, if a claimant has

nonexertional impairments which "significantly limit the range of work permitted by his

exertional limitations," then the Commissioner cannot rely upon the grids, and instead

"must introduce the testimony of a vocational expert ["(VE")](or other similar evidence)

that jobs exist in the economy which claimant can obtain or perform."[6] *Pratts v. Chater*,

---

[6]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(a). "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to

94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d)[7]; see also, *Bapp v. Bowen*, 802 F.2d

601, 605 (2d Cir. 1986) ("If the guidelines adequately reflect a claimant's condition, then

their use to determine disability status is appropriate. But if a claimant's nonexertional

impairments significantly limit the range of work permitted by his exertional limitations

then the grids obviously will not accurately determine disability status because they fail to

take into account claimant's nonexertional impairments.") (citation and internal quotation

marks omitted).  More specifically,

> where the claimant's work capacity is significantly diminished beyond that
> caused by his exertional impairment the application of the grids is
> inappropriate.  A claimant's work capacity is "significantly diminished" if
> there is an additional loss of work capacity that so narrows a claimant's
> possible range of work as to deprive him of a meaningful employment
> opportunity.

*Pratts v. Chater*, 94 F.3d at 39 (citations and internal quotation marks omitted).  Put

another way, a claimant's work capacity is "significantly diminished" if the nonexertional

impairments cause "the additional loss of work capacity *beyond a negligible one*." *Bapp*

*v. Bowen*, 802 F.3d at 606 (emphasis added).  The term "negligible" is defined as "so

insignificant as to be unworthy of consideration." Webster's II New College Dictionary

(Houghton Mifflin Co. 1995).

---

remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the
inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a(c).

[7]20 C.F.R. § 416.969(d) provides, in relevant part, that, "[w]hen the limitations and restrictions
imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the
strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider
that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not
directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are
disabled based upon your strength limitations; otherwise the rule provides a framework to guide our
decision."

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).  Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

***

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due

17

to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE ALJ'S DECISION

On April 9, 2010, the ALJ issued the decision that is the subject of this action. (10-18).  The ALJ began by noting that Plaintiff met insured status through March 31, 2008, and that Plaintiff must therefore demonstrate that she was disabled on or before that date. (10)

At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had not engaged in substantial gainful employment since April 1, 2000. (12)  The ALJ therefore determined that the work that Plaintiff performed between 2004 and 2006, as a cashier, was not substantial gainful activity ("SGA").

At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "lower back pain with stenosis at L5-S1; cervical pain with bulges; obesity . . . ; ankle [sic] pain status post fracture with internal fixation; and fibromyalgia." (12).   On the other hand, the ALJ found that Plaintiff's depression was not severe, because "she does not now and has never received treatment for depression," and because "she has not alleged any limitations to her daily functioning because of depression." (13)  However, as discussed above, the ALJ was factually mistaken about whether Plaintiff had ever received treatment for depression.  In that regard, the records indicate that Plaintiff received such treatment, and Plaintiff also testified to that fact during the hearing. (41) (Indicating that she was being treated for depression, and that she felt "sad a lot.")

At step three of the five-step analysis, the ALJ found that Plaintiff did not have a

18

listed impairment. (13).

At step four of the five-step analysis, the ALJ found that Plaintiff could perform her past relevant work, which the ALJ identified as being  "a cashier at Lowes or Kwik Fill." (17)   Alternatively, the ALJ used the "grids" to find that Plaintiff was not disabled.  As to this finding, the ALJ concluded that Plaintiff's claimed nonexertional impairments had "little or no effect on the occupational base of unskilled light work." (18)

The ALJ based these determinations on his RFC assessment, which was that Plaintiff could perform "light work," with the following limitations: "able to occasionally climb ramps/stairs/ladders/ropes; occasionally balance, stoop, kneel, crouch, and/or crawl; able to understand, remember and carry out only very short and simple instructions as found in unskilled work." (14)  In making this finding, the ALJ relied heavily on that portion of Sabahat's records that indicated that Plaintiff had been noncompliant in seeking an evaluation from a neurosurgeon and in obtaining facet joint injections.  From that, the ALJ concluded that Plaintiff's symptoms "may not have been as serious" as she claims. (14-15).  The ALJ also quoted one of Sabahat's treatment notes, dated November 12, 2009, which indicated that Plaintiff "was doing very well as far as her low back and upper back pain is concerned" (15, 515), to suggest that Plaintiff's back pain was not as bad as she claimed. (15)

However, the ALJ rejected Sabahat's opinion that Plaintiff was limited to working only two hours per day (527-528), finding that Sabahat's opinion was internally inconsistent. (16)  The ALJ cited two problems with Sabahat's opinion.  First, he indicated that because Sabahat stated that Plaintiff could sit for two hours and stand/walk for two hours, Sabahat should have concluded that Plaintiff could work a total

of four hours per day, not two. (16)  Second, the ALJ stated that Sabahat imposed

greater limitations on Plaintiff than Plaintiff claimed to have. (16)  The ALJ, though, did

not explain exactly how Sahabat's limitations exceeded those claimed by Plaintiff.[8]

The ALJ also gave little weight to Llinux-Lux's opinion, finding that it was

"questionable." (15)  As to Llinux-Lux's report,  the ALJ stated that, "There is little

discussion as to specifics of her tender points[9] or other symptoms, and there are no

limitations mentioned because of fibromyalgia." (15)  Consequently, the ALJ seems to

reject the diagnosis of fibromyalgia, even though he previously found that it was a severe

impairment.

The ALJ also gave little weight to McAndrew's opinion.  In that regard, the ALJ

observed that, "McAndrews found that claimant could not maintain a regular schedule, or

maintain attention and concentration due to fatigue and depression from pain. " (16)

However, the ALJ summarily rejected McAndrews opinion by stating that, "Dr.

McAndrews, as a psychologist is not in the best position to evaluate claimant's

complaints of pain." (17)  The ALJ did not discuss the fact that McAndrews' opinion was

essentially consistent with that of Hochberg, who found that Plaintiff had  "major

depression" and "panic disorder" (410, 412), or the fact that Hochberg had indicated that

Plaintiff had moderate limitations with regard to understanding and remembering detailed

---

[8]As noted above, Plaintiff stated that she could sit comfortably for fifteen-to-twenty minutes before needing to move around, and that she could stand for "sometimes a half hour." (47)  She further indicated that she could walk not "very far," "maybe a block." *Id.*

[9]It is unclear what further discussion the ALJ expected concerning Plaintiff's tender points.  As to that, it appears that fibromyalgia typically requires tenderness in only "11 or more of the designated tender points," and Plaintiff had tenderness in all eighteen of the designated spots. *See*, The Merck Manual Home Health Handbook, http://www.merckmanuals.com/home/bone_joint_and_muscle_disorders/muscle_bursa_and_tendon_diso rders/fibromyalgia.html

instructions, carrying out detailed instructions, maintaining concentration and attention for

extended periods, performing activities within a schedule, completing a normal workday

and workweek without interruptions from psychologically based symptoms, and

performing at a consistent pace without an unreasonable number of breaks. (421-422)

ANALYSIS

*The work that the ALJ identified as past relevant work was not SGA*

At the outset it is clear that the ALJ erred by indicating that Plaintiff could perform

her past relevant work as a cashier.  By definition, past relevant work must be SGA,[10]

and the ALJ had already concluded that any work performed after 2000, including

Plaintiff's work as a cashier, was not SGA.  Consequently, it appears that Plaintiff's only

past relevant work was her ten-year job as a "laborer/assembly line worker" at a

"metal/steel manufacturing company." (124)

Moreover, although the ALJ alternatively found that Plaintiff could perform other

work, he did so by relying solely on the grids.  As discussed further below, such reliance

on the grids may have been erroneous, to the extent that Plaintiff has nonexertional

impairments which significantly limit the range of work permitted by her exertional

limitations.  In such case, the ALJ must obtain evidence from a VE, or other similar

evidence, that jobs exist in the economy which Plaintiff can perform.

---

[10]In that regard, to qualify as "past relevant work," work must qualify as "substantial gainful activity." *See*, 20 C.F.R. § 404.1560(b) (1) ("Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."); *see also, Hignite v. Shalala*, 25 F.3d 1057, 1994 WL 235558 at *1 (10th Cir. Jun.2, 1994) (unpublished, table) ("Among other requirements, past relevant work must be substantial gainful employment.") (citing 20 C.F.R. 416 .965(a); other citation omitted).

_The severity of Plaintiff's impairments_

The Court also agrees with Plaintiff that the ALJ made a factual error in finding that Plaintiff's depression was not a severe impairment.  Specifically, the ALJ indicated that Plaintiff had never received treatment for depression, when in fact she had. (41); _see also_, Docket No. [#9-2] at p. 43-44.  Moreover, the Commissioner's review physician, Hochberg, indicated that Plaintiff had "major depression" and "panic disorder." (410, 412).  The ALJ also erred by describing Plaintiff's ankle condition as "ankle pain status post fracture with internal fixation." (12)  Actually, it was Plaintiff's arm that was fractured and required internal fixation, while Plaintiff's ankle was merely dislocated, swollen, and painful.

As for Plaintiff's  left shoulder/arm pain and right knee pain, the ALJ did not discuss why those impairments were not severe. (12-13, 15)  On remand, the ALJ should include those conditions in his discussion of the severity of Plaintiff's impairments.  Of course, the ALJ must also consider whether any combination of impairments is severe. _See_, 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.")

_The RFC Determination_

Plaintiff maintains that the ALJ's RFC determination is erroneous, because the ALJ failed to give the proper weight to the opinions of Plaintiff's treating sources, and

because he failed to properly assess Plaintiff's credibility.  In that regard, the ALJ

concluded: "As for the opinion evidence, weight is given to claimant's treating physicians

to the extent that they allow for light work." (17)  Regarding such finding, Plaintiff

contends that the regulations require more specificity, and the Court agrees.  Moreover,

the Court does not believe that the ALJ's decision to essentially reject Sabahat's opinion,

concerning Plaintiff's ability to work, was supported by substantial evidence.  For

example, the ALJ seems to have placed an almost dispositive amount of weight on the

fact that Plaintiff delayed seeing a neurosurgeon, declined to have back surgery, and

missed appointments to receive pain injections. (14-15)   Specifically, the ALJ seems to

have focused on Sabahat's progress note dated August 16, 2007, in which Sabahat

expressed annoyance that Plaintiff had not followed up on his recommendations from

their last visit on March 22, 2007. (336-337)  However, the record as a whole indicates

that Plaintiff had severe pain, due to degenerative disc disease and fibromyalgia, for

which she actively pursued a variety of different treatments and medications over a

period of years, most of which were not successful.  Neither Sabahat nor any other

doctor who examined Plaintiff indicated that she was malingering or exaggerating her

symptoms.  The ALJ also indicated that he was disregarding Sabahat's RFC report

because it was internally inconsistent.  On this point, Sabahat stated that Plaintiff could

sit, stand, and/or walk for up to four hours per day, but only work for two hours per day.

However, even assuming that Plaintiff could work four hours per day instead of two hours

per day, he would still be disabled from full-time work.

On the other hand, the ALJ seems to have given greater weight to the opinions of

Toor, a non-treating doctor who examined Plaintiff on one occasion, and Vriesema, who

never examined Plaintiff. (17)  The ALJ indicated that his RFC assessment was supported by the opinions of Toor and Vriesema. (17)  However, Toor indicated that Plaintiff had moderate limitations on her ability to sit, stand, and walk, and that her obesity and migraine headaches could negatively affect her ability to work. (400). Moreover, Vriesema's opinion that Plaintiff could stand, walk, and sit for up to six hours each per day, seems inconsistent with Toor's findings, as well as the rest of the record. Accordingly, the Court does not view Vriesema's report as being substantial evidence to support the ALJ's decision.

Similarly, the Court finds that the ALJ did not give a sufficient explanation for why he chose to disregard the opinions of Llinas-Lux and McAndrews.

Finally, the Court agrees with Plaintiff that the ALJ did not properly develop the record with regard to Plaintiff's credibility, and that he failed to fully consider the record as a whole regarding Plaintiff's efforts to obtain treatment.  With respect to this, the ALJ found that Plaintiff may have exaggerated her symptoms, because she at times failed to follow up on Sabahat's treatment recommendations.  However, the Commissioner's regulations require to ALJ to inquire about the reasons why a claimant fails to obtain treatment:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are

> good reasons the individual does not seek medical treatment or does not
> pursue treatment in a consistent manner.

SSR 96-7p, 1996 WL 374186 at *7 (SSA Jul. 2, 1996).  At the hearing, Plaintiff explained

that she was reluctant to have surgery, because her doctor advised her that there was no

guarantee that the surgery would alleviate her pain. (33)  Plaintiff also indicated that she

had received several injections of pain medications which were not successful. (32-33)

Additionally, Plaintiff underwent a number of various surgeries to relieve her pain,

including shoulder surgery and multiple surgeries on her arms.  However, it is unclear

whether the ALJ considered those points in making his credibility determination.

CONCLUSION

For the reasons set forth above, Defendant's motion for judgment on the

pleadings [#5] is denied, Plaintiff's cross-motion for judgment on the pleadings [#9] is

granted, and this matter is remanded to the Commissioner for further administrative

proceedings pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is

directed to close this action.

So Ordered.

Dated: Rochester, New York
        February 3, 2012

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge